**Else WILLHEIM and Randolph Phillips, Plaintiffs,**

v.

**John D. MURCHISON et al., Defendants.**

United States District Court
S. D. New York.

March 29, 1962.

Leonard I. Schreiber, New York City, for plaintiff Else Willheim.

Randolph Phillips, pro se.

Davis, Polk, Wardwell, Sunderland & Kiendl, New York City, for defendant Investors Mutual, Inc. Taggart Whipple, New York City, of counsel.

Debevoise, Plimpton & McLean, New York City, for defendant Investors Diversified Services, Inc. Samuel E. Gates, New York City, of counsel.

DAWSON, District Judge.

This is a motion for a preliminary injunction brought by the plaintiffs, in which they seek to enjoin the performance of the investment advisory and underwriting distribution contracts heretofore entered into between the defendants Investors Diversified Services, Inc. and Investors Mutual, Inc.

The action is one brought by the plaintiffs derivatively as stockholders of Investors Mutual, Inc., a registered investment company.

It appears without dispute that Investors Diversified Services, Inc. (hereinafter called "IDS") has acted as principal underwriter and investment adviser for Investors Mutual, Inc., pursuant to written contracts dated April

6, 1960. The plaintiffs contend that those contracts have been terminated as of May 1, 1961, as a result of acts by the defendant John D. Murchison and his associates culminating in a successful proxy contest for control of Alleghany Corporation in the spring of 1961. As of May 1, 1961, the date of Alleghany Corporation's annual meeting, Alleghany Corporation held approximately 47.6% of the voting stock of IDS. Judgment is sought declaring that the contracts are null and void and that they have been performed since May 1, 1961 in violation of the contract terms and of the Investment Company Act, 15 U.S.C.A. § 80a–1 et seq. The contention of the plaintiffs is that by virtue of the change in control of Alleghany Corporation the contracts have been "assigned" within the meaning of the Investment Company Act and are therefore terminated.

The Investment Company Act provides in part, in 15 U.S.C.A. § 80a–15(b):

"After one year from the effective date of this subchapter * * * it shall be unlawful for any principal underwriter for a registered open-end company to offer for sale, sell, or deliver after sale any security of which such company is the issuer, except pursuant to a written contract with such company, which contract * * *

\* \* \* \* \* \*

"(2) provides, in substance, for its automatic termination in the event of its assignment by such underwriter."

In subdivision (d) of the same subsection it is provided that

"It shall be unlawful for any person—

. "(1) to serve or act as investment adviser of a registered investment company, pursuant to a written contract * * * after March 15, 1945, or the date of termination

provided for in such contract, whichever is the prior date, or after assignment thereof subsequent to March 15, 1940, by the person acting as investment adviser thereunder."

In accordance with the statute, the underwriting and investment advisory contracts here in question provided for their termination upon any "assignment" by IDS.

The principal issue on this motion is whether the underwriting and investment advisory contracts have been assigned within the meaning of the contracts and the Investment Company Act. It was admitted by the representatives of the plaintiffs at the argument of the motion that there had been no formal assignment of those contracts by IDS. It was contended however that the contracts had been "assigned" by operation of law by reason of the definition of "assignment" found in 15 U.S.C.A. § 80a–2 (a) (4). "Assignment" is there defined as meaning "any direct or indirect transfer or hypothecation of a contract or chose in action by the assignor, or of a controlling block of the assignor's outstanding voting securities by a security holder of the assignor * * *."

The plaintiffs' moving papers do not establish that any controlling block of IDS's outstanding voting securities was transferred after April 6, 1960, the date when the contracts were entered into. The plaintiffs admit that at all times after that date control of IDS was, and still is, held by Alleghany Corporation. Plaintiffs seem to contend however that subsequent to that date control of Alleghany Corporation was transferred from the interests which previously had control of it to what they denominate as the "Murchison group" and that this transfer of control of Alleghany Corporation constituted a transfer of a controlling block of IDS's voting securities.[1]

1. The word "control" is defined in the Investment Company Act as "the power to exercise a controlling influence over the management or policies of a company, unless such power is solely the result of an official position with such company." The section also provides that "[a]ny person who owns beneficially, either directly or

It was not contended by the plaintiffs that there had been a transfer of 25 per cent of the outstanding voting securities of IDS since April 6, 1960. It was contended that there had been a transfer of more than 25 per cent of the voting securities of the Alleghany Corporation subsequent to that date and that since Alleghany Corporation admittedly owned a controlling interest in IDS such transfer of control of Alleghany Corporation was equivalent to the transfer of a controlling block of IDS's outstanding voting securities. The difficulty with this argument is that Congress did not define "assignment" as encompassing any change of control of a corporation. It defined "assignment" in very specific language. It defined it as a transfer of a controlling block of the "assignor's outstanding voting securities by a security holder of the assignor." [2] Plaintiffs have not shown that any security holder of IDS transferred a controlling block of IDS's outstanding voting securities. Plaintiffs, therefore, do not come within the precise language of the statute. It may be that Congress should have broadened the statute by defining "assignment" as including a change of "control" rather than limiting it to the transfer of a controlling block of the outstanding voting securities by a security holder of the assignor. However, it is not for the Court to rewrite a statute which was passed by Congress and which apparently is a carefully drawn statute to accomplish the objectives which Congress had in mind.[3]

Plaintiffs urge a rather strained construction of the statute by arguing that a change in the controlling interest of the stock of a company which controlled the assignor was the equivalent of a transfer of a controlling block of the voting securities of IDS. If Congress had so intended it would have been easy to write the Act in this manner. It did not s᷍ write it and the Court cannot substitute its own language for that of legislation adopted by Congress.

There seems to be little dispute that as a result of a proxy contest at Alleghany Corporation control of that corporation was acquired by stockholders supported by what was known as the "Murchison group." However, the facts would seem to indicate that even this change of control of Alleghany Corporation was not accomplished by a transfer of a controlling block of Alleghany's outstanding stock. It appears that at the annual meeting of Alleghany Corporation a proxy contest took place between the so-

---

through one or more controlled companies, more than 25 per centum of the voting securities of a company shall be presumed to control such company. Any person who does not so own 25 per centum of the voting securities of any company shall be presumed not to control such company." 15 U.S.C.A. § 80a–2(a)(9).

2. The typical case of a transfer of a controlling block constituting an "assignment" and the consequent automatic termination of the investment advisory and underwriting contracts is seen in a case which involved IDS. Prior to April 27, 1949 control of IDS was held by one B. C. Gamble by virtue of his ownership of 57% of its outstanding voting stock. On that date he sold his stock to Alleghany Corporation and the Securities and Exchange Commission concluded that the transfer "of this controlling block" of the voting stock of IDS resulted in an "assignment" and the consequent automatic termination of the contracts. See, In the Matter of Investors Diversified Services, Inc., 30 S.E.C. 273 (1949).

3. As Judge Rifkind said in Doyle v. Milton, 73 F.Supp. 281, at pp. 284, 285 (S.D.N.Y.1947):
"* * * The Investment Company Act is a carefully framed statute in which Congress has, with particularity, stated the means and methods, both judicial and administrative, by which its declaration of policy is to be executed. It has not confided in the courts a broad discretion to shape judicially contrived remedies for the mischief it has discovered. Insofar as power is entrusted to the courts under this Act its exercise must, of course, be steered toward the fulfillment of the national policy as declared. The policy itself, however, when declared in a statute as comprehensive and detailed as this Act, does not authorize the courts to fashion sanctions withheld by Congress. See Stone, The Common Law in the U.S. 1936, 50 H.L.R. 4, 13."

called "Kirby group" and the so-called "Murchison group." The Kirby group apparently owned more stock than the Murchison group, but neither group owned a majority of the outstanding shares. Prior to the proxy contest the Kirby group was in control of Alleghany Corporation and they made no transfer of their "controlling block" of stock. The outcome of the election was determined by the fact that over 70 per cent of the independent stock at the annual meeting, unaffiliated with either the Murchison group or the Kirby group, voted for the nominees of a stockholders' committee supported by the Murchisons. While this may well have represented a change of control of Alleghany Corporation it was not, so far as the papers disclose, a transfer of a controlling block of stock; on the contrary, it seemed to be a transfer of control determined by the democratic voting processes of the stockholders of Alleghany Corporation. If the Investment Company Act was intended to require that such transfer of control would result in termination of underwriting and investment advisory contracts, it should have been so stated. In that case this would have been a material representation which would have had to be included in the proxy statement in the course of the proxy fight of Alleghany Corporation.

Even if a transfer of a controlling block in a controlling corporation was deemed to be an assignment within the meaning of the Investment Company Act there has been no sufficient proof presented in the papers to establish that the transfer of control of Alleghany Corporation was accomplished by a transfer of a controlling block of stock, rather than the independent judgment of the independent stockholders who retained their stock and did not transfer it.

Why Congress did not provide that a transfer of "control" rather than the transfer of a "controlling block" of stock would represent an "assignment" is a matter upon which we may only speculate. It may be that Congress felt it would be too difficult to police a situation where change of control resulted from the votes of independent stockholders. It may be that the evils which Congress was seeking to correct had principally been carried into effect by the private transfer for private profit of controlling blocks of stock. Thus in the report of the Securities and Exchange Commission on the study of investment trusts and investment companies submitted to Congress on June 9, 1941, which was the precursor to the enactment of the Investment Company Act, we find the Commission stating, at page 18 of Volume 4 of its final report:

"Control, in general, by investment companies was usually established through private purchases of large blocks."

In any event the Act, as finally enacted, defined an "assignment" as resulting from the transfer of "a controlling block of the assignor's outstanding voting securities by a security holder of the assignor." It did not refer to a transfer of control resulting from the votes of the independent stockholders of the company holding the voting securities of the assignor.

■ To grant the preliminary injunction as sought by the plaintiffs would deprive Investors Mutual, Inc. of the services of their investment advisers and underwriting advisers. This would be a serious situation when we consider that the portfolio of Investors Mutual, Inc. exceeds $1,900,000,000, and that it has more than 329,000 stockholders, and that IDS has 635 employees and more than 3300 sales representatives situated throughout the United States. Cessation of the services furnished by Investors Diversified Services, Inc. to Investors Mutual, Inc. would cut the latter adrift and leave it without management for its portfolio securities and without income from the sales of its stock. These very serious consequences should not be imposed by the Court unless the Court is convinced beyond peradventure of a doubt that plaintiffs will succeed in the principal action and get the relief sought

482

in the complaint. McFarland v. Building
Material Teamster Local 282, 180 F.Supp.
806, 809 (S.D.N.Y.1960). In view of
the facts heretofore set forth in this
opinion, the Court is not convinced that
plaintiffs will succeed at the trial in the
contentions which they are advancing.
Under the circumstances it would be
improper for the Court at this prelimi-
nary stage in the litigation to grant
plaintiffs substantially the principal re-
lief sought in the litigation by now grant-
ing a preliminary injunction. While a
preliminary injunction may be granted
to maintain the status quo pendente lite,
it ought not ordinarily be used to give
final relief before trial. United States v.
Adler's Creamery, Inc., 107 F.2d 987,
990 (2d Cir. 1939). This is particularly
true when the basis upon which the
preliminary injunction is sought is as
weak as it is in the present case.

The motion for preliminary injunction
is denied. So ordered.