**Else WILLHEIM and Randolph Phillips, Plaintiffs,**

v.

**John D. MURCHISON and Clint W. Murchison, Jr., copartners, doing business as Murchison Brothers, Investors' Diversified Services, Inc., and Investors Mutual, Inc., Defendants.**

United States District Court
S. D. New York.
June 22, 1964.

See also D.C., 206 F.Supp. 733.

Leonard I. Schreiber, New York City, for plaintiff Willheim.

Randolph Phillips, pro se.

Debevoise, Plimpton, Lyons & Gates, New York City, Samuel E. Gates, J. Asa Rountree, New York City, of counsel, for Investors Diversified Services, Inc.

Davis, Polk, Wardwell, Sunderland & Kiendl, New York City, Philip C. Potter, Jr., and Dennis H. Allee, New York City, of counsel, for Investors Mutual, Inc.

Townley, Updike, Carter & Rodgers, New York City, Stuart N. Updike, Lee W. Meyer, New York City, of counsel, for John D. Murchison.

George E. MacKinnon, Minneapolis, Minn., General Counsel for Investors Mutual, Inc.

DAWSON, District Judge.

This is a motion for summary judgment pursuant to Rule 56 of the Rules of Civil Procedure. Pursuant to the provisions of subsection (d) of this rule, the Court by interrogating counsel ascertained what material facts exist without substantial controversy and what material facts were actually and in good faith controverted.

## THE FACTS

The following facts appear to exist without substantial controversy:

1. The action is brought by the plaintiffs derivatively on behalf of Investors Mutual, Inc., a registered investment company.[1]

2. Investors Diversified Services, Inc. (hereinafter called "IDS") has acted as principal underwriter and investment adviser for Investors Mutual, Inc., pursuant to written contracts dated April 6, 1960.

3. At all times after April 6, 1960, control of IDS was and still is held by Alleghany Corporation.

4. No controlling block of IDS's outstanding voting securities was transferred after April 6, 1960.

5. After April 6, 1960, and on May 23, 1961, there was a change of control of Alleghany Corporation.

6. At all times from January 1, 1960 until May 23, 1961, Allan P. Kirby controlled Alleghany Corporation. He was the largest single stockholder of Alleghany and at all such times the board of directors of Alleghany was composed of persons personally selected by Allan P. Kirby. No transfer was made by Kirby of his controlling block of stock.

7. Prior to May 23, 1961, a proxy contest was instituted by defendants John D. Murchison and Clint W. Murchison, Jr., for control of Alleghany Corporation. They organized a committee to solicit proxies for directors of a new board of Alleghany Corporation at the annual meeting of shareholders held on May 1, 1961. The committee denominated themselves as the "Committee for Better Management of Alleghany Corporation" and thereafter changed its name to "Stockholders Committee for Better Management of Alleghany Corporation." There were eventually 25 members of this stockholders committee.

8. As of April 14, 1961, the record date for the annual meeting, Allan P. Kirby, his "associates" and "participants" (as such terms are defined in the SEC proxy rules) beneficially owned an aggregate of 3,303,289 shares of Alleghany common stock, 4,200 shares of preferred stock, and 2,000 unexercised warrants. As of the same date the 25 members of the stockholders committee, their "associates" and "participants," beneficially owned an aggregate of 2,853,970 shares of common stock, 9,660 shares of preferred stock and 24,501 unexercised warrants. The total outstanding stock of Alleghany Corporation at the record date consisted of 9,844,970 shares of common stock and 522,875 shares of preferred stock. Each share of common stock was entitled to one vote for each of 7 directors and each share of preferred stock was entitled to one vote for each of 2 additional directors. It thus appears that neither Kirby and his associates, nor the Murchison committee and their associates, owned a majority of the stock of Alleghany Corporation.

9. At the annual meeting of Alleghany shareholders which was convened on May 1, 1961 and adjourned from time to time until May 23, 1961, 9,201,005 shares of common stock and 388,632 shares of preferred stock were represented. As a result of the votes of the stockholders at the said meeting the nominees of the stockholders committee

---

1. The plaintiffs are Randolph Phillips and his mother-in-law. They own between them approximately .000001 of the outstanding stock of Investors Mutual. They seek a declaration that certain underwriting and investment advisory contracts, dated April 6, 1960, between Investors Mutual, Inc. and Investors Diversified Services, Inc. have been terminated and are null and void, and for an accounting of profits and damages.

(Murchison) were elected as directors of Alleghany. The votes for the 7 Kirby directors totaled 4,172,013 shares. The votes for the committee shareholders (the Murchison slate) totaled 5,026,011 (with the exception of one of the nominees who received 10 less votes than the others). The outcome of the election was determined by the fact that over 37% of the common stock was not owned by either Kirby and his associates or the members of the stockholders committee and their associates, and that 70% of this group voted for nominees of the stockholders committee supported by the Murchisons. The result of the voting was a change of management of Alleghany Corporation from Kirby management to Murchison management.

The above facts appear to exist without substantial controversy. The facts set forth in the 9(g) statement filed by the moving party on these points were not controverted by the 9(g) statement submitted by Mr. Phillips, and the moving papers seem to indicate that these facts exist without substantial controversy. The issue which exists is not one of fact but one of law which involves an interpretation of the provisions of the Investment Company Act of 1940, 15 U. S.C. § 80a–1 et seq. Mr. Phillips stated at the oral argument that under his construction of the statute there wasn't any issue of fact. (Tr. p. 25–26.)

THE LAW

The basic question presented by this action is whether or not the transfer of control of Alleghany acted as an "assignment" of the investment advisory and distribution agreements between Mutual and IDS. Section 15(a) (4) of the Investment Company Act provides that

" * * * it shall be unlawful for any person to serve or act as investment adviser of a registered investment company, except pursuant to a written contract, which contract * * * has been approved by the vote of a majority of the outstanding voting securities of such registered company and—

* * * * * *

"(4) provides, in substance, for its automatic termination in the event of its assignment by the investment adviser."

Section 15(b) (2) sets up a similar requirement for the distribution agreement except that no vote of the security holders is necessary.

"Assignment" is defined in 15 U.S.C. § 80a–2(a) (4) as including

" * * * any direct or indirect transfer or hypothecation of a contract or chose in action by the assignor, or of a controlling block of the assignor's outstanding voting securities by a security holder of the assignor * * *."

Plaintiffs in this case contend that by reason of the transfer of control of the Alleghany Corporation at the 1961 annual meeting there was an "assignment" which automatically terminated the written contract dated April 6, 1960 with IDS under which IDS had acted as principal underwriter and investment adviser for Investors Mutual, Inc. This issue involves one of law, i. e., what is meant by that part of the definition of "assignment" in 15 U.S.C. § 80a–2(a) (4) which defines it as "any direct or indirect transfer * * * of a controlling block of the assignor's outstanding voting securities by a security holder of the assignor." Since there is no dispute as to the underlying facts in this matter, and since the dispute is a matter of law, it is appropriate that summary judgment be considered.

There is no dispute that there was not a transfer of a block of stock of the investment adviser, IDS. The Securities and Exchange Commission, in a letter to the Court dated June 3, 1964, takes the position that there should be an automatic termination of the advisory contract whenever there is a transfer of any block of stock which is, in fact, a controlling block, even if it is not the stock of the investment adviser but is stock of a corporation which in turn controls the investment adviser. It urges that this would be an "indirect transfer" of a controlling block of the assignor's outstand-

ing voting securities within the meaning of § 80a–2(a) (4). The Court is ready to agree with the view of the SEC on this point and to decide the matter from the standpoint as to whether there was a transfer of a controlling block of Alleghany Corporation, which was the corporation that controlled the investment adviser.

The plaintiffs have failed to show any facts which would indicate that there was a transfer of a controlling block of securities of Alleghany Corporation.[2] That there was a transfer of control as a result of the proxy fight is undisputed. Under the statute, however, the question is whether there was a transfer of "a controlling block of the * * * outstanding voting securities by a security holder * * *."

There is no dispute that the controlling block of Alleghany's voting securities was owned by the Kirby interests and that no part of that block was transferred. The undisputed facts show that the victory of the Murchison interests in the proxy fight was not due to the transfer of a controlling block of stock by a security holder but rather to the success of the Murchisons in securing the votes of stockholders who did not transfer their securities but who gave their proxies to the Murchison committee. The outcome of the election was determined by the fact that 70% of the stock not owned by or transferred to either the Murchison or the Kirby groups voted for nominees of the stockholders committee supported by the Murchisons. This resulted in a transfer of control of the corporation but it was a transfer of control determined by the democratic voting processes of the stockholders of Alleghany Corporation and not as a result of a "transfer * * * of a controlling block of the assignor's outstanding voting securities by a security holder." Congress might have provided that a

transfer of "control" rather than a transfer of a "controlling block" of stock would represent an "assignment." It did not do that. It limited assignment to a *transfer* of a "controlling block" of stock *by a security holder*. It is not for this Court to rewrite the statute which was passed by Congress and apparently is a carefully drawn statute to accomplish the objectives which Congress had in mind. See, Doyle v. Milton, 73 F.Supp. 281, at p. 284–285 (S.D.N.Y.1947).

■ When Congress wished to direct that certain consequences would follow from a change of control it had no difficulty or hesitancy in so stating. "Control" is defined in § 80a–2(a) (9) as "power to exercise a controlling influence over the management or policies of a company, unless such power is solely the result of an official position with such company." "Control" is, of course, an issue of fact, although a person who controls directly or indirectly more than 25% of the voting securities of a company is presumed to control it.

■ What plaintiffs are contending is that a change of control is the equivalent of transfer of a controlling block of stock. This, of course, is not so. It may be that the evils which Congress was seeking to correct by this act had principally been carried into effect by the private transfer for private profit of controlling blocks of stock. See the Report of the SEC on the Study of Investment Trusts and Investment Companies submitted to Congress on June 9, 1941 at page 18 of volume 4 of its final report, reading as follows:

"Control, in general, by investment companies was usually established through private purchase of large blocks."

To make an assignment depend upon a change in "control" rather than a transfer of a controlling block of securities

2. The only substantial transfers of blocks of Alleghany stock incident to the proxy contest appear to have been the following securities acquired by the Murchisons and their "associates": (1) 1,004,221

shares from Mrs. Young and the estate of Robert R. Young, and (2) 1,132,117 shares purchased on the open market from small holders. Neither of these blocks of stock was a controlling block.

would present problems which Congress might have thought would have been insurmountable. For example, would the death of members of the board of directors resulting in the election of a new president result in an assignment of the investment advisory contracts? Would the election by the stockholders of a corporation of certain directors other than those previously in office represent an assignment even though there had been no transfer of a controlling block of stock?

If the Investment Company Act was intended to require that transfer of control would result in termination of underwriting and investment advisory contracts it should have been so stated. In that case it would be a material representation which would have to be included in the proxy statement in the course of each election of directors of the investment adviser and of any corporation controlling it. The act did not define assignment as a change in the control of a corporation resulting from a determination of the shareholders to vote for a new slate of directors. The act defined assignment as a transfer of a controlling block by the assignor's outstanding voting securities by a security holder of the assignor. This is the act which we have to apply. In order to come within its language it would be necessary for the plaintiffs to show that there was a transfer directly or indirectly of a controlling block of the outstanding voting securities by a security holder. The defendants say there was no such transfer. The plaintiffs have been unable to present any facts which would indicate that there was such a transfer of a controlling block of stock by any security holders of either IDS or Alleghany Corporation which resulted in this change of control. Plaintiffs have not disputed the essential facts set forth in the 9(g) statement of the defendants and Rule 9(g) of the General Rules of this court provides in part that

"All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party."

## CONCLUSION

Under the circumstances and under the uncontroverted facts and the interpretation of law by the Court, there is no alternative but to grant the motion for summary judgment. To allow the case to go to trial on the undisputed facts would be a waste of judicial time.

The motion for summary judgment dismissing the complaint is granted. So ordered.