**Else WILLHEIM and Randolph Phillips, Plaintiffs-Appellants,**

v.

**John D. MURCHISON and Clint W. Murchison, Jr., co-partners d/b/a Murchison Brothers, and Investors Diversified Services, Inc., Defendants-Appellees,**

**and**

**Investors Mutual, Inc., Defendant.**

**No. 190, Docket 29126.**

United States Court of Appeals Second Circuit.

Argued Dec. 1, 1964.

Decided Feb. 10, 1965.

---

Randolph Phillips, New York City, appellant pro se (Leonard I. Schreiber, New York City, on brief, for appellant Else Willheim).

Samuel E. Gates, New York City (Debevoise, Plimpton, Lyons & Gates, New York City, J. Asa Rountree, Robert J. Geniesse, J. Edward Fowler, New York City, of counsel), for Investors Diversified Services, Inc.

Stuart N. Updike, New York City (Townley, Updike, Carter & Rodgers, New York City, Lee W. Meyer, Peter G. Kelly, New York City, of counsel), for John D. Murchison and Clint W. Murchison, Jr.

Taggart Whipple, New York City (Davis, Polk, Wardwell, Sunderland & Kiendl, New York City), for Investors Mutual, Inc.

Before FRIENDLY and SMITH, Circuit Judges, and BLUMENFELD, District Judge.*

FRIENDLY, Circuit Judge.

The affairs of Alleghany Corporation, from its founding by the Van Sweringen brothers in 1929, have given rise to a flood of litigation that must be unparalleled in American corporation law. Even a single phase of its activity, its relationship with Investors Diversified Services, Inc. (IDS), of which Alleghany obtained control in 1949, has been a bounteous provider for the Securities and Exchange Commission and the courts, especially the District Court for the Southern District of New York and this court. This appeal concerns a chapter of Alleghany ten years after the one that recently occupied our attention in Alleghany Corp. v. Kirby, 333 F.2d 327 (2 Cir. 1964), court equally divided on rehearing *in banc*, 340 F.2d 311 (1965); the present case concerns the dislodgment in 1961 of the Kirby management by its quondam ally, the Murchison brothers, and the effect of this on the contracts between IDS and one of the investment companies for which IDS acts as investment adviser and underwriter.

Alleghany bought a controlling interest in IDS in 1949; though its holdings have varied, it has held 47.6% of IDS's voting stock during the period in 1960 and 1961 here relevant. As of January 1, 1960, Allan P. Kirby and two corporations controlled by him owned 571,200 shares of Alleghany common stock and 143,210 shares of 6% preferred, each convertible into 4.7 shares of common on payment of $3.75 per common share. The next largest stockholding was that of Robert R. Young's widow, who individually and as executrix owned 250,717 shares of common and 160,320 shares of 6% convertible preferred. Kirby's nominees were elected as directors at the Alleghany annual meeting on May 2, 1960.

In September, 1960, the Murchison brothers, with two other Alleghany stockholders, organized a committee to elect a new board of directors at the annual meeting of stockholders on May 1, 1961. Earlier in 1960, they had contracted to acquire Mrs. Young's holdings, on which they immediately obtained the voting rights; as a result of the purchase of her common stock and the conversion of preferred stock acquired from her, they obtained 1,004,221 common shares.[1] Before the record date for the Alleghany annual meeting in 1961, they and their participants and associates had acquired by miscellaneous purchases of common stock (or by conversion of preferred stock or exercise of warrants similarly purchased) another 1,132,117 shares of common, and other members of their committee with participants and associates owned or had similarly acquired a further 717,632 common shares. These three items totaled 2,853,970 shares of the common stock. Meanwhile Kirby had been fighting fire with fire; on the record date he and the other participants and associates with him owned 3,303,289 shares of Alleghany common. 3,043,746 common shares represented at the 1961 meeting were not owned by either side.[2]

* Sitting by designation.

1. The initial contract, dated January 30, 1960, with the father of the Murchison brothers, provided for purchases on various dates beginning March 1, 1960, and ending August 31, 1962. The contract was assigned to the brothers on March 1, 1960. In accordance with a provision in the contract, a supplemental agreement, dated April 7, 1961, accelerated the schedule so that the shares not yet purchased were acquired that month.

2. In 1961 the Alleghany common was entitled to elect seven out of nine directors, the remaining two being elected by the convertible preferred. The ownership of the common shares as of the record date was as follows:

| | Number | % |
|---|---|---|
| Kirby, his participants and associates | 3,303,289 | 33.6 |
| Murchisons' Committee, their participants and associates | 2,853,970 | 29.0 |
| Not owned by either group and represented at the meeting | 3,043,746 | 30.9 |
| Not owned by either group and not represented at the meeting | 643,965 | 6.5 |
| | 9,844,970 | 100.0 |

Approximately 71% of these "free" shares were voted for the Murchison slate, which won by some 854,000 votes. The tellers certified the victory on May 23, 1961; on that day the newly chosen directors elected John D. Murchison as president and chief executive officer of Alleghany. At a special meeting of IDS stockholders on July 18, 1961, Alleghany caused the election of eight new directors while retaining two others as holdovers from the IDS board that Kirby had selected; the new IDS board was under Murchison control and Clint W. Murchison, Jr. became chairman.

Sections 15(a) and (b) of the Investment Company Act of 1940 (15 U.S.C. §§ 80a–1 to 80a–52), make it unlawful to act as investment adviser for a registered investment company or as principal underwriter for a registered open-end company except pursuant to a written contract, approved by a majority of the outstanding voting securities in the case of the investment adviser and by a disinterested majority of the directors in the case of the underwriter, which must provide, *inter alia,* "for its automatic termination in the event of its assignment" by the investment adviser or underwriter. In May, 1961, IDS was acting as investment adviser and as principal underwriter to Investors Mutual Inc., an open-end company, under contracts with such termination provisions. Section 15 (d) ties the knot by making it unlawful to act as investment adviser or principal underwriter under a written contract after assignment thereof. Finally, § 2(a) (4) instructs us that:

> "(4) 'Assignment' includes any direct or indirect transfer or hypothecation of a contract or chose in action by the assignor, or of a controlling block of the assignor's outstanding voting securities by a secu-

rity holder of the assignor * * *."

The gravamen of the complaint in the instant derivative action, brought by two stockholders of Investors Mutual in the District Court for the Southern District of New York, as authorized by § 44 of the Act, is that IDS continued to act as investment adviser and principal underwriter for Investors Mutual although, allegedly, the events here recounted were an "assignment." The principal relief asked was an injunction preventing further performance of the contracts allegedly terminated[3] and repayment to Investors Mutual of profits and damages that had accrued since the assignment. See, e. g., Lutz v. Boas, 39 Del.Ch. 585, 171 A.2d 381 (1961). Contending that on the undisputed facts there was no assignment, IDS and the Murchisons made motions for summary judgment dismissing the complaint, which Judge Dawson granted, 231 F.Supp. 142 (1964). Although we consider the case closer than he did, we affirm.[4]

■ There is little dispute that certain of the possible forms of "assignment" listed in § 2(a) (4) must be eliminated straight away. There was no "hypothecation of a contract or chose in action by the assignor." Likewise there was no "direct * * * transfer" of a contract; IDS made no attempt to substitute another as holder of its contracts for investment advisory and underwriting services with Investors Mutual. Neither was there a "direct * * * transfer * * * of a controlling block of the assignor's outstanding voting securities by a security holder of the assignor." In the context of § 15 the "assignor" is the person rendering investment advisory or underwriting services—here IDS; and the "controlling block" of IDS has remained where it had been for over a decade—in Alleghany's treasury. The

---

3. New contracts with IDS, approved by a majority of the outstanding voting stock of Investors Mutual, became effective April 6, 1963.

4. Our previous affirmance of Judge Dawson's denial of a temporary injunction,

Willheim v. Investors Diversified Services, Inc., 2 Cir., 303 F.2d 276 (1962), affirming 203 F.Supp. 478 (1962), did not reach the merits. See Comment, Termination of Management Contracts under the Investment Company Act of 1940, 63 Colum.L.Rev. 733 (1963).

serious questions are whether there was an "indirect transfer," either of a "controlling block" or of the contracts themselves.

Since the statute requires transfer "of a controlling block of the assignor's outstanding voting securities *by a security holder of the assignor*," the absence of any transfer of IDS stock by Alleghany would thus, on a literal reading, be as complete an obstacle on the "indirect" as it is on the "direct" path. Yet this conclusion, it can well be argued, shows the need for avoiding such literalism in order to give some effect to the possibility, envisioned by the statute, of an "indirect" transfer of a controlling block by means such as there described. An answer might be that sufficient effect would be given by considering "indirect" to have been included to cover cases where a separate corporate layer was interposed, or some other device was used, in the absence of any significant business purpose, e. g., if ownership of IDS had been vested in a company created for the sole object of holding its stock, and a controlling block of stock in the holding company was transferred—a situation not contended to be present here, where Alleghany had existed long before its purchase of a controlling interest in IDS in 1949 and continued to have many other interests. We by no means reject this possible construction. Serious problems are created, particularly as regards stockholders having no connection with the transfer of a controlling block, if the Draconian sanctions of § 15(d) are visited upon a company, having many other purposes, that has acquired a controlling interest in an investment adviser or underwriter. Although minority stockholders in a company of the latter sort are likely to be familiar with the Investment Company Act—or may fairly be treated as if they were, it is somewhat unrealistic to suggest that the public stockholders of Alleghany, who voted predominantly with the Murchisons in the proxy contest, were on notice that a Murchison victory might impair the value of the brightest jewel in Alleghany's crown, and consequently unfair to penalize them for having done so.

However, we shall here assume, *arguendo*, that the definition is broad enough to include the transfer of a controlling block of the voting securities of an owner of a controlling block of the assignor's voting securities by a security holder of that owner, even when the owner is not a company created to hold the assignor's stock. In making that assumption we in no way accept appellants' further contention that whenever a group controlling Alleghany lost control to another group, this would inevitably constitute an indirect transfer of a controlling block of IDS by its security holders within the meaning of § 2(a) (4). Shortly we will set down in another context our reasons for believing that Congress did not mean that the mere change in management or control of an investment adviser or underwriter was an "assignment" terminating its contract. While those reasons are equally applicable on the issue here considered, it is even more certain that Congress did not intend that such a change, occurring as the result of a proxy contest in a parent corporation controlling the adviser but without transfer of a controlling block of the parent's stock, could constitute an "indirect transfer * * * of a controlling block of the assignor's securities." If such a change took place through a similar proxy fight among the immediate owners of the adviser itself, no one could conclude that any "controlling block" had been transferred directly or otherwise, and it would be a contradiction to treat a transaction *more* harshly when it occurs in the company controlling the adviser than in the adviser itself. We stretch the word "indirectly" as far as permissible—if not indeed too far—when we treat the case as if Alleghany itself were the investment adviser. Hence we proceed to consider whether the transfer of a controlling block of Alleghany stock has been shown.

The only transaction in the present record that might constitute such a transfer would be Mrs. Young's sale of her

stock to the Murchisons. Viewing the matter as of the first of January, 1960, the month in which she committed to sell and vest the Murchisons with voting rights, her stock, assuming complete conversion of her preferred shares, would have represented 1,004,221 common shares. At the same time, on a similar assumption, Kirby would have had 1,244,287 common shares. The total outstanding common shares, giving effect to both assumed conversions, would have been 6,717,968. The Young stock would thus have been slightly less than 15% and the Kirby stock somewhat more than 18% of the total. If the figures of Young and Kirby ownership in January, 1960, are related to the 9,884,970 common shares outstanding on the record date in 1961 as a result of further conversions and the exercise of warrants—probably a more realistic test—the proportions are reduced to almost 11% for the Young stock and 13% for the Kirby stock.

Section 2(a) (9) of the Investment Company Act contains provisions as to "control" which we quote in the margin.[5] It is clear that Kirby and Young together had controlled Alleghany for twenty years, until Young's death in 1958, and it could hardly be doubted that a sale of their combined holdings would have been the transfer of a controlling block. Very likely a sale of Kirby's shares alone in 1960 would have been such a transfer even though these were considerably less than 25% of Alleghany's voting securities, for Kirby had nominated the Alleghany board and pre-sumably could have procured their resignations in favor of a transferee. This dual transfer of the single largest block along with the board of directors and the important corporate proxy machinery could reasonably be said to overcome the negative presumption of § 2(a) (9) that less than 25% ownership does not control.[6] But is the same true of the block held by Mrs. Young?

In giving a negative answer we do not underestimate the strategic character of the Young holdings. So far as the record shows, these were by far the largest block of Alleghany common shares save for the Kirby holdings, and those were only slightly larger if the Young preferred was converted, as it was likely to be in a contest for control since the preferred was selling at a price reflecting the price of the common. It must have been, and quite obviously was, apparent to the Murchisons that the first step in a successful bid to oust the Kirby management was to prevent any possibility of Kirby's getting the vote of the Young stock by putting this securely in their own corner. The correctness of this judgment is shown by the fact that, even after all the stock buying and the vote of 71% of the "free" stock for the Murchisons, the margin of victory was less than the stock purchased from Mrs. Young.

■ The concept of control is relevant to a number of provisions in the Investment Company Act and has been examined by the SEC in more than one decision. E. g., M. A. Hanna Co., 10 S.E.C. 581 (1941); Transit Inv. Co., 23

5. "(9) 'Control' means the power to exercise a controlling influence over the management or policies of a company, unless such power is solely the result of an official position with such company.

"Any person who owns beneficially, either directly or through one or more controlled companies, more than 25 per centum of the voting securities of a company shall be presumed to control such company. Any person who does not so own more than 25 per centum of the voting securities of any company shall be presumed not to control such company. A natural person shall be presumed not to be a controlled person within the meaning of this subchapter. Any such presumption may be rebutted by evidence, but except as hereinafter provided, shall continue until a determination to the contrary made by the Commission by order either on its own motion or on application by an interested person. * * *"

6. We here follow the SEC, Fundamental Investors, Inc., SEC Investment Co. Act, Release No. 3596 (Dec. 27, 1962), in assuming that a court, as well as the SEC, may determine that the presumption of § 2(a) (9) has been overcome, and may do so without preliminary resort to the administrative agency.

S.E.C. 415 (1946); Chicago Corp., 28 S.E.C. 463 (1948). However, in construing the variant term "controlling block," the emphasis must be on transferable elements of power and due attention must be given to the precise regulatory provision invoked. Obviously, management will give an attentive hearing to any sizable stockholder and a single share may prove decisive in an even contest; but where the amount is less than 25% and has no other indicia of control, it is not a "controlling block" unless ownership itself fairly presages victory. In the present case, Mrs. Young's block was not the single rallying point for an otherwise widely scattered ownership but was somewhat smaller than the Kirby holdings against which it would be pitted in a contest. More important, it was the Kirby block that was tied to the directorships and the proxy machinery. It is impossible in these circumstances to overcome the negative presumption of § 2(a) (9) that a block smaller than 25% does not control; especially is this so in the context of § 15 where Congress must have recognized the importance of clearly alerting the adviser or underwriter that a specific transfer of stock required immediate action to obtain renewal of contracts.

 Indeed, appellants do not seriously urge that IDS' contracts with Investors Mutual were assigned by the Murchisons' acquisition of purchase and voting rights in the Young stock early in 1960 or even by the outright transfer of the stock itself in April, 1961, standing alone. They say rather that the transfer of the Young shares, *plus* the purchase of other shares, *plus* the grant of proxies by the majority of the "free" stock, assuring the subsequent Murchison victory and the attendant change in Alleghany's board, constituted the assignment. We will shortly consider whether

all this amounted to an "indirect transfer * * * of a contract." But the provision speaking of the "transfer * * of a controlling block" contemplates that such a block exist and be transferred and not merely that purchases of large and small amounts eventually bring the controlling interest into one pair of hands. We recognize that a coordinated transfer by several associates sharing the controlling interest among them may meet the definition, compare SEC v. Insurance Sec., Inc., 254 F.2d 642 (9 Cir.), cert. denied, 358 U.S. 823, 79 S.Ct. 38, 3 L.Ed.2d 64 (1958). Yet by no stretch of the statutory language can the block sold by Mrs. Young be swelled by the unrelated sales to the Murchisons by numberless other sellers, let alone by the revocable proxies given by those who never sold their stock at all.[7] What Mrs. Young had was not a "controlling block" but a block enormously valuable and even necessary for a successful challenge to Kirby's control. Whether or not this might be control in some other context, it is not enough to make her stock a "controlling block" for purposes of § 2 (a) (9) and the attendant consequences under § 15.

 It is with this background that we approach the other branch of the definition and the contention that the Alleghany proxy fight successfully conducted by the Murchisons worked an "indirect transfer" of the contracts between IDS and Investors Mutual. Appellants properly stress the direction, in § 1 of the Investment Company Act, that its provisions shall be interpreted so as "to mitigate and, so far as is feasible, to eliminate the conditions enumerated in this section which adversely affect the national public interest and the interest of investors," one of which, § 1(b) (6), is "when the control or management * * * [of investment companies] is trans-

---

**7.** Appellants contend that had discovery and trial taken place, proof that the Murchisons controlled a still larger number of shares (through unrevealed associates and friendly brokers) than those shown in fn. 2 might have been forthcoming. However, at no point have appellants suggested that there occurred any significant transfer of stock from the original Kirby-Young group to the Murchison block apart from the sale by Mrs. Young.

**40**

ferred, without the consent of their security holders." In a colloquial sense it may be true that the result of the Alleghany proxy contest "transferred" the "management" not merely of IDS but also of an investment company, to wit, Investors Mutual, without the consent of the latter's stockholders, and, correspondingly, appellants would have us read the terms "indirect transfer * * * of a contract" in § 2(a) (4) to extend to every change of "control or management" of an investment adviser. But we find it hard to read so broadly terms that Congress appears to have chosen with care, especially when nothing could have been simpler than to specify that any change of "control or management" of an adviser constituted a transfer. We surely should not do this without firm evidence that Congress considered events like the Alleghany proxy contest as abuses to be remedied by the automatic termination provisions.

The legislative history makes rather clear that the abuses under reference in § 1(b) (6) were voluntary transfers of control and not dislodgments through proxy contests. The worst abuse, and one which the language of § 1(b) (6) precisely fits, had been a sale by controlling stockholders of the investment company itself. The current dominance of the investment company field by open-end companies may prove misleading as to the meaning of the 1940 legislation. In 1936, the last year for which figures are given in the pertinent section of the SEC's Report on Investment Trusts and Investment Companies (1938–42), which led to the Investment Company Act, 68.2% of the industry's funds were held by incorporated closed-end companies, and the proportion had been as high as 92% in 1929, 2 id. 125–26. Many of these companies were highly leveraged, and because of the disfavor into which they had fallen after the 1929 crash,

their shares were selling at discounts from the market value of the underlying assets. Sponsors of the funds owning the control stock would seek exits by selling at a premium to unscrupulous buyers who, after seating new directors as a result of seriatim resignations, would reimburse themselves for the purchase price by exchanging worthless securities for marketable ones in the company's portfolio. Notorious examples were the sales of controlling stock in and the subsequent looting of Insuranshares Corporation and Reynolds Investing Corporation, see Insuranshares Corp. of Delaware v. Northern Fiscal Corp., 35 F. Supp. 22 (E.D.Pa.1940), and Gerdes v. Reynolds, 28 N.Y.S.2d 622 (Sup.Ct.1941). The remedy for this abuse was not § 15 (d) but the disqualification of certain persons from serving as officers and directors of a fund, § 9, the important ban against blanket replacement of boards, § 16(a), the bar on certain kinds of self-dealing, § 17, and similar provisions directly concerned with the investment company itself. Open-end companies had offered opportunities for seizing control by the purchase of management contracts, usually held by privately held corporations or partnerships organized by the founders of the fund, or of these companies themselves.[8] The SEC Report lists instances of the sale of the management contract or of the stock of the management company or of the assets of the partnership—acts clearly constituting "assignments"—followed by resignations and replacement of the directors of the fund. Transactions of these sorts appear to be what Congress had in mind and all that it described in § 1(b) (6) even on a liberal reading. We have not been shown the slightest evidence that it gave any thought to the effect on investment advisory or underwriting contracts of a proxy contest in a publicly held adviser or underwriter—still less of

8. Because the need for capital has been small, this close control is still fairly typical, although the number of secondary offerings of the stock of advisory companies and affiliated underwriters has

been increasing recently. A Study of Mutual Funds, H.Rep.No. 2274, 87th Cong., 2d Sess. 452–65 (1962) (prepared for the SEC by the Wharton School of the University of Pennsylvania).

such a contest in a publicly held multi-purpose company controlling the adviser or underwriter. While this history would give no sufficient reason for cutting down the words that Congress used, it does afford ground for refusing to expand them.

Two other considerations reinforce this conclusion. The first is that § 15(d) is only one of many road-blocks set up to avoid the evils summarized in § 1(b) (6). We have already referred to some. Additionally § 13 prohibits certain significant changes in the policy of an investment company save by shareholder vote, § 15(a) (2) demands, after two years, annual approval of advisory contracts by the directors or the shareholders, and § 15(a) (3) requires a contractual provision for termination at any time, on 60 days' notice, at the instance of the board of directors or the shareholders. These provisions must be read along with § 10, designed to provide some independence in the board of directors, and with what we have said as to the nature of the duty of all directors in passing on annual renewals, Brown v. Bullock, 294 F.2d 415, 420 (2 Cir. 1961). Section 18 is directed at undue leverage in closed-end companies, and § 20 regulates the soliciting of proxies from investment company shareholders. This battery of protective provisions designed "to mitigate and, so far as is feasible, to eliminate the conditions enumerated" in § 1(b), weakens the case for giving an unusual construction to any one; Congress may have been relying on some other clearly applicable provisions to deal with a particular problem.

The other consideration is that a proxy contest, especially one conducted under § 14 of the Securities Exchange Act, 15 U.S.C. § 78n, has few of the characteristics of the transactions with which Congress was concerned, whereas stretching the concept of transfer of an investment advisory or underwriting contract to include cases where control of

the adviser or underwriter was altered by such a contest without a transfer of "a controlling block" would contravene other policies. The transfers over which Congress was concerned had been conducted by a few sellers and a buyer, usually in secret; the minority stockholders of closed-end and the investors in open-end companies would not even know of them until the looting was over. A proxy contest governed by § 14 of the Securities Exchange Act receives much publicity—in this instance a glare of it; indeed, the contest in Alleghany was expressly called to the attention of Investors Mutual's shareholders in proxy material for their annual meeting on April 5, 1961, where they rejected resolutions for termination of the contracts with IDS. After conclusion of the contest there was a continuing opportunity to Investors Mutual to terminate the contracts without penalty upon 60 days' notice. As against this, adoption of the principle urged by appellants would strengthen the position of an incumbent management of a publicly held investment adviser or underwriter, or of a company controlling one, and, because of the threat of termination,[9] would restrict the free exercise of the franchise by the stockholders. It is true that the Alleghany proxy contest, featured by enormous stock purchases by both sides, was scarcely an example of Athenian or New England democracy. But 71% of the "free" stock voted for the challengers and Congress has not seen fit to put a penalty on such purchases, even in investment advisers or underwriters, save when a controlling block is transferred.

■■ Appellants argue finally that since § 2(a) (4) in defining "assignment" uses the verb "includes" rather than "is," the failure of a transaction to come within its terms does not necessarily mean that an assignment has not occurred. Although the proposition is true enough, it does not assist appellants.

9. It is not a sufficient answer to say that renewal by shareholder vote is usually easy to procure. No one could be sure of this, and it is doubtful whether the SEC would, or properly could, permit any prophecies to be included in proxy material.

Definitions in securities and other legislation often use the word "include" out of abundant caution, and this serves a clear purpose when one or more of the things stated as included would not be so in the ordinary meaning of the term defined —as, here, the transfer of a controlling block. But that does not afford *carte blanche* to "include" transactions, neither expressly mentioned nor within the normal meaning of the language, simply because a court may think this a good idea. The Investment Company Act, the product of joint effort and compromise by the SEC and the industry, was drafted with a good deal of specificity; a court should give it a hospitable reception but ought not expand its words beyond their natural meaning to bring within its sweep a transaction, such as that here at issue, which is not the "mischief and defect" aimed at by the Act and which it is doubtful that Congress would have wished to include if it had considered the problem. Compare Blau v. Lehman, 368 U.S. 403, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962).

Affirmed.