Alvin HERZOG, Plaintiff,

v.

Philip A. RUSSELL, Harris J. Ashton,
Charles B. Johnson, Edmund H. Kerr,
Edwin C. McDonald, Franklin Distribu-
tors, Inc. and Franklin Custodian Funds,
Inc., Defendants.

No. 71 C 1704.

United States District Court,
E. D. New York.

Dec. 17, 1979.

Ira Jay Sands, New York City, for plaintiff.

Cole & Dietz, New York City by Albert D. Jordan, New York City, for defendants Charles B. Johnson and Franklin Distributors, Inc.

Leslie Kirsch, New York City, for defendants Philip A. Russell and Harris J. Ashton.

## MEMORANDUM DECISION

SIFTON, District Judge.

A trial in the above action was held in April 1979. The following constitutes the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

This is a derivative action brought by Alvin Herzog, a shareholder since August 18, 1969, of defendant, Franklin Custodian Funds, Inc. (the "Fund"), on behalf of and for the benefit of the Fund. The action was begun in 1971. The named defendants are the Fund, five of its directors, and Franklin Distributors, Inc. ("Distributors"). The case against one of the directors, Edmund H. Kerr, was dismissed by this Court on September 25, 1978, for lack of prosecution. Defendant McDonald was never served and did not appear at trial.

The Fund is a registered investment company of the "mutual fund" type which sells shares to the public. Distributors was owned and controlled by defendant, Charles B. Johnson ("Johnson"), a director of the Fund, and by Rupert H. Johnson. Distributors acted pursuant to contract as investment advisor and principal distributor of the Fund's shares.

The complaint sets forth four distinct claims in a single cause of action alleging (1) that the Agreement between the Fund

and Distributors provided for an excessive management fee, (2) that Distributors derived benefits at the expense of the Fund through techniques known as "give ups" and "reciprocals," caused the Fund to pay higher than necessary brokerage commissions and to neglect opportunities to trade in the "third market," and failed to recapture brokerage commissions for the benefit of the Fund by organizing its own brokerage subsidiary, (3) that restricted securities were given an excessive valuation resulting in excessive management fees and excessive share redemption payments, and (4) the Fund is entitled to an accounting for all profits derived by defendants from a public offering of 19% of the stock of Franklin Resources, Inc. ("Resources"), the corporate parent of Distributors. Plaintiff's claims for excessive management fees and for improper valuation of restricted securities were withdrawn prior to trial.

Leave to file an amended complaint was granted by this Court in a Memorandum Decision and Order dated April 19, 1978, but the order granting such leave was never complied with. Plaintiff, instead, attempted to serve and file an amended and supplemental complaint differing substantially from that for which permission had been sought. On October 6, 1978, in a further Memorandum and Order, this Court indicated that amendment of the complaint to conform to proof offered during trial would be allowed with regard to claims based on the following issues:

1. Whether defendants violated applicable provisions of the statutes and regulations referred to in the complaint by failing to disclose to stockholders and independent directors of the Fund that there were opportunities for the recapture of brokerage commissions which the Board of Directors of the Fund had not pursued.

2. Whether defendants violated applicable provisions of the statutes and regulations referred to in the complaint by failing to disclose to the stockholders of the Fund an assignment of the investment advisory agreement between the Fund and Distributors as a consequence of an alleged transfer of control in Distributors said to have resulted from the following transactions: the pre-December 1969 private placement of stock of Distributors by certain defendants; the December 1969 acquisition of Distributors by Resources; and the 1971 distribution of stock of Resources to the public.

The potential inclusion of such proxy rule issues by the Order of this Court was without prejudice to litigation concerning the relation back of the claims asserted by such amendment under Fed.R.Civ.P. 15(c) for purposes of defenses based on limitations and laches. Defendants contend that the new issues sought to be raised by amendment were not part of the transaction or occurrence attempted to be set forth in the original pleading and must be considered to have been introduced into the case by the Order of October 13, 1978. As such, defendants contend that these issues are barred by laches.

Because the Court finds no basis for liability on either of the claims set forth above, it need not decide the issue of whether the claims should relate back to the date of the original complaint.

This case presents questions examined before in this Circuit concerning the duties of investment advisor and mutual fund with respect to recapture of brokerage commissions earned on transactions in the Fund's portfolio for the benefit of the fund. The applicable legal principles in this Circuit are laid down in *Tannenbaum v. Zeller*, 552 F.2d 402 (2d Cir. 1977), and *Fogel v. Chestnutt*, 533 F.2d 731 (2d Cir. 1975), *cert. denied*, 429 U.S. 824, 97 S.Ct. 77, 50 L.Ed.2d 86 (1976), which approved with qualifications the landmark decision in *Moses v. Burgin*, 445 F.2d 369 (1st Cir.), *cert. denied*, 404 U.S. 994, 92 S.Ct. 532, 30 L.Ed.2d 547 (1971), the first Court of Appeals decision dealing with the recapture problem.

The background of the recapture problem is set forth in the opinions in *Fogel, supra,* and *Tannenbaum, supra,* and will not be repeated here. The cause of the problem was eliminated by the Securities Act Amendments of 1975, Pub.L. No. 94–29, 89 Stat. 97, which forbade exchange transac-

tions for one's own account or that of an associate and eliminated the imposition of fixed commission rates by securities exchanges. *See Tannenbaum v. Zeller, supra,* 552 F.2d at 409.

## FIDUCIARY DUTY

■ Plaintiff contends that the failure to recapture brokerage commissions violated defendants' fiduciary duty to Fund.[1]

■ Although plaintiff referred to customer directed give-ups in his pretrial papers and at trial as an available method of recapture, such practices were prohibited by the SEC prior to the time that plaintiff became a shareholder of the Fund and, thus, were not an available method of recapture during the period in question. Investment Company Act, Rel.No.5554 (Dec. 3, 1968).

The evidence at trial focused on two specific recapture methods which plaintiff alleges continued to be available to the Fund during the relevant period. These are preferred rate non-membership on the Pacific Coast Stock Exchange ("PCE")[2] and affiliated membership on the Philadelphia-Baltimore-Washington Exchange ("PBW").

In *Tannenbaum v. Zeller, supra,* the Second Circuit held that a decision to forego recapture did not violate the fiduciary obligations of the Fund's adviser or directors under section 36 of the Investment Company Act, 15 U.S.C. § 80a-1 et seq. (the "Act"), "if the independent directors (1) were not dominated or unduly influenced by the investment adviser; (2) were fully informed by the adviser and interested directors of the possibility of recapture and the alternative uses of brokerage; and (3) fully aware of this information reached a reasonable business decision to forego recapture after a thorough review of all relevant factors." 552 F.2d at 418–19. A review of the record indicates that these conditions were met in the present case.

In 1969, the Fund's directors consisted of Philip A. Russell, Harris J. Ashton, Edmund H. Kerr, James A. Howe and Edwin C. McDonald. The defendant Johnson, who was then a controlling shareholder of Distributors, succeeded James A. Howe as a director on September 23, 1969. O. Townsend McMillan succeeded Edwin C. McDonald as a director in August of 1972. Other than Johnson, none of the Fund's directors was an "affiliated" or "interested person" of Distributors as those terms are defined by the Act, 15 U.S.C. § 80a-2, and all such outside directors, other than Russell, who was retired, had independent business interests. Based on all the testimony in this case, it does not appear that these outside directors were dominated, controlled or unduly influenced by Distributors and Johnson.

Plaintiff contends that Distributors could have established an affiliate as a member of PBW, and this affiliate could have acted as an introducing broker and obtained commission discounts. Although setting up and acquiring PBW membership for such an affiliate was possible, plaintiff failed to establish that such membership was economically worthwhile for a fund of the size of Franklin. Defendants' expert, a former PBW Senior Vice President, testified that it was not economically feasible for the Fund to join PBW solely for recapture purposes, and this Court finds no evidentiary basis for rejecting this testimony.

Although the matter of recapture through affiliated membership on a stock exchange was first formally considered at a meeting of the Fund's Board of Directors on April 21, 1971, Johnson had kept the Fund's Board informed of developments relating to mutual fund brokerage from time

1. Although plaintiff refers to fiduciary duty, under both the common law and the Investment Company Act, because the standards under the Act are at least as stringent as those of common law, only those standards need be considered. *Tannenbaum v. Zeller, supra,* 552 F.2d at 416 n.20.

2. Although the plaintiff's trial memorandum raises the possibility of membership in the PCE, the deposition testimony of plaintiff's expert, Thomas Phelan, was the membership was not available to an advisor such as Distributors which did not have a captive sales force.

to time, and informal discussions of recapture occurred at the times such information was furnished. For example, Johnson advised the Board of an SEC release (No. 8746 available 11/10/69) consisting of a letter written by Philip Loomis, Esq., General Counsel of the SEC, stating that there was no duty on the part of a mutual fund management to acquire a stock exchange seat for purposes of recapturing brokerage commissions through an affiliate if, in the exercise of its best business judgment, the management determines that it is not in the best interest of the fund to have or create such an affiliate.

While the circumstances under which the subject of recapture through affiliated stock exchange membership was formally raised for a decision by the Fund's Board on April 21, 1971, are not clear, it is clear that a definite decision not to seek recapture by membership on an exchange was reached at a meeting held on June 16, 1971. It is also clear that the members of the Fund's Board were sufficiently knowledgeable at the time of the availability, advantages, burdens and disadvantages of brokerage recapture to make an informed business decision on the matter.

■ Given the substantial burdens and disadvantages of brokerage recapture through affiliated membership on the PBW, the legal uncertainties attendant on the operations of a brokerage affiliate which obtained inter-member give-ups at the direction of a mutual fund investment advisor without performing any real brokerage functions, the speculative prospect of obtaining best execution of the Fund's portfolio transactions on such exchange, and the apparent regulatory trend toward the negotiation of commissions and the banning of affiliated membership on registered securities exchanges, the decision of the Fund's directors not to seek such recapture through affiliated membership on a regional stock exchange was a proper exercise of business judgment. *Tannenbaum v. Zeller, supra.*

There was also evidence at trial that Board members were interested in seeking recapture which they considered in the Fund's best interest. The minutes of the June 16, 1971, Board meeting indicate that the Board "affirmed the principle that Franklin Distributors should obtain any share of brokerage or other commissions when to do so would be legitimate" and that the amount realized would be applied to reduce Distributors' fee. Testimony at trial indicated that this represented, in part, a decision that Distributors should seek to recapture soliciting broker's fees in tender offers.

Further evidence of the interest of the Fund's Board in seeking the benefits of available recapture is supplied by its decision, reached at a meeting held on April 24, 1972, to require that Distributors qualify for non-member preferred rate status on the PCE. Plaintiff contends, however, that the Board should have qualified for preferred rate non-membership on the PCE much earlier.

Preferred rate non-membership on the PCE would have allowed Distributors, as a member of the National Association of Securities Dealers ("NASD"), to collect a discount equal to 25% of the commission on orders by the Fund placed and executed on the PCE by Distributors as an "introducing broker." Although the Fund would be charged the full commission, the 25% rebated to Distributors could have been credited against the advisory fee. Prior to April 24, 1972, the Fund directors had discussed the possibility of Distributors obtaining PCE non-member discounts, but had rejected the possibility because of their belief, which was shared by most others in the brokerage industry, that the rules of the PCE required that such transactions be handled on an "undisclosed basis" meaning that the introducing non-member was required to confirm the execution of the introduced transaction to its customer as a broker and thereby to accept responsibility for the transaction to the investor. Since fails (non-payment or non-delivery) by the other side of the trade would be the responsibility of the introducing non-member, the risks attendant on handling such transactions on an undisclosed basis were considered unac-

ceptable for purposes of brokerage recapture. The testimony of Mr. Thomas J. Phelan, a President of PCE, was that some few member firms were carrying accounts for some few non-member firms on a fully disclosed basis prior to 1971, but that PCE was never asked whether such arrangements were generally permissible until after the *Moses v. Burgin* decision and that he did not know how Distributors could have known prior to 1972 of the availability of non-member discounts on a fully disclosed basis (Dep. at 112–14).

In December 1971, Mr. Phelan, in response to inquiries by the staff of the SEC and mutual fund distributor, stated that, while the matter had not been ruled on by the PCE Board of Governors, it was his view that the PCE rules did not prohibit the introduction of brokerage business by preferred rate non-members to PCE members on a "fully disclosed" basis. Such exchange of correspondence became available to the securities industry in the early part of 1972 and was reported by Johnson to the Fund's Board. The significance was that, by introducing the Fund's portfolio transactions to PCE members on a fully disclosed basis, Distributors would have no contingent liability for the transaction and could freely pass on the net proceeds of such recapture to the Fund.

After discussion, Distributors agreed to file its application for preferred rate non-member status with the PCE and to advance the required annual fee of $100 which commencing in 1973 was raised to $1,000. Thereafter, Distributors did reduce the Fund's management fee by the net proceeds of such PCE non-member recapture as it was able to effect. However, the occasions on which the Fund's portfolio transactions could be executed on the PCE in preference to the primary markets were not numerous and, as a result, the management fee reductions were not substantial.

■ There was no evidence that any reasonable investigation by the Board could have discovered the existence of fully disclosed non-member discounts on the PCE prior to early 1972. Nor is there any basis to conclude that Distributors or the Board failed to investigate the possibilities of recapture "with an eye eager to discern them rather than shut against them." *Fogel v. Chestnutt, supra*, 533 F.2d at 749. If in fact PCE non-member discounts were available for recapture by the Fund, the failure to discover this fact was not the result of intentional or reckless conduct, but was at most negligence; and, thus, there was insufficient scienter to establish liability under the Act. *Sullivan v. Chase Investment Services*, D.C., 79 F.R.D. 246, 259. Given the testimony, however, I find it a matter of speculation whether Distributors could have obtained non-member discounts prior to the date it did. In other words, it is a matter of speculation whether the discount became generally available as a result of *Moses v. Burgin* or whether the industry became aware of its availability as a result of that decision.

## ALLOCATION OF COMMISSIONS

Plaintiff alleges that the allocation of brokerage commissions to compensate brokers who sold shares or furnished research and statistical services constituted a violation of the fiduciary duty of Distributors and of its contractual agreements with the Fund. Plaintiff argues that the sale of shares and research were contractual obligations of Distributors and that using Fund assets to discharge these functions was self-dealing. A similar argument was rejected by the Second Circuit in *Fogel v. Chestnutt, supra* at 744–45; and *Tannenbaum v. Zeller, supra* at 415–16. The selling of more shares and the obtaining of research above and beyond that which Distributors would otherwise provide both benefitted the Fund.

It does not appear that there were any agreements or understandings by which Distributors committed itself to allocate specified amounts of the Fund's portfolio brokerage commissions as, in effect, an added commission for the sale of shares of the Fund. Nor is there any evidence that Distributors increased the Fund's portfolio brokerage expenses by employing brokerage firms to effect portfolio transactions which

might have been otherwise effected at lesser costs, or that such direction of the Fund's portfolio brokerage was otherwise inconsistent with its interests. Both Distributors and the Fund derived benefits from sales of the Fund's shares. The proceeds of such sales enabled the Fund to redeem its shares (as it was required to do on the request of any shareholder at the then per-share net asset value of the underlying portfolio) without potentially disadvantageous impairment of its investment program through premature liquidations of portfolio positions. To the extent sales exceeded redemptions, potentially advantageous portfolio purchases could be made and the burden of the Fund's operating expenses, other than its management fee, could be spread over a larger asset base and thereby diluted. Since the proceeds of such large sales affected directly the amount of net assets on which its management fee was computed, Distributors derived a direct and quantifiable benefit.

Investment research and statistical information obtained by allocations of the Fund's portfolio brokerage enabled Distributors to compare and update the basis of its investment advice and recommendations with the views, information and conclusions of investment analysts associated with various brokerage firms and enabled Distributors to make the required daily computations of the net asset value of each series of the Fund's shares (based on the daily closing market value of the assets of each portfolio). It gave to Distributors and to the Fund the benefit of current information on the issuers of publicly traded securities, industry trends and the prospects of the national economy which no single investment advisory organization could develop on its own. The availability of such research and information did not, however, supplant the performance by Distributors of any material aspects of the duties or obligations required of it by the advisory agreement.

■ Although the advisory agreements between the Fund and Distributors were silent on the subject, it appears that the right of Distributors to make such alloca-tions was an implicit assumption of the agreements. The right to allocate the Fund's portfolio brokerage, consistent with the requirements of best execution, to brokerage firms which sold shares of the Fund or provided research and information to Distributors was expressly recognized in the prospectuses of the Fund and consistent with the prevailing and accepted business practice of the industry. Under the circumstances, it appears that the approval of such allocations by the Fund's directors was a reasonable exercise of business judgment. The use of brokerage commissions to compensate brokers who supplied research and sold shares does not, by itself or in combination with other acts referred to by plaintiff, violate any duty on the part of Distributors. *Tannenbaum v. Zeller, supra.* The fact that brokerage allocations were so made and that this might reduce the expenses of Distributors was fully disclosed.

## PROXY DISCLOSURE ON RECAPTURE

Plaintiff also contends that the proxy statements issued to the Fund's shareholders violated SEC Rule 14a–9, 17 C.F.R. § 240.14a–9(g), as made applicable to investment companies, *see Galfand v. Chestnutt Corp.,* 545 F.2d 807 (2d Cir. 1976), by failing to disclose material facts as to the opportunities to recapture commissions and the Board's decision to forego recapture. In *Tannenbaum v. Zeller, supra,* the Second Circuit held that, even though the decision to forego recapture was justified, the failure to disclose the opportunities and the Board's decision violated the proxy rules. Plaintiff contends that *Tannenbaum v. Zeller* requires a similar result in the present case. This Court disagrees.

In *Tannenbaum v. Zeller, supra,* F. Eberstadt & Co., Inc. ("Eberstadt"), the parent company of the investment advisor, was at all material times a member of the New York Stock Exchange ("NYSE"). In *Tannenbaum,* all parties agreed that the fund could have executed transactions through Eberstadt on the NYSE, and Eberstadt could have credited a portion of the brokerage commission against the management

fee. In *Tannenbaum*, the board of directors of the fund, recognizing that this method of recapture was readily available, consistently directed that Eberstadt not act as a broker in fund portfolio transactions. 552 F.2d at 411–13. The Second Circuit held that this decision to forego readily available recapture opportunities on the NYSE was justified under the business judgment rule, but also held that the availability of such recapture and the decision to forego it should have been disclosed. 552 F.2d at 429, 434.

■■ No comparable methods of recapture were available to defendants in the present case. Distributors had no affiliate who was even a securities dealer, let alone a member of the NYSE. In fact, it is clear that no recapture on NYSE transactions was available in the present case. In *Tannenbaum*, "[m]anagement recognized that the decision to forego available recapture opportunities was a significant and controversial one which involved substantial amounts of money." 552 F.2d at 433–34. In the present case the decision was rightfully not regarded as significant or controversial. Plaintiff has failed to demonstrate, nor is there any reason to believe, that any significant amount of recapture was available in a manner consistent with best execution. Insofar as the Board recognized that recapture was a possible alternative, it properly did not consider it a reasonable one. The Second Circuit in *Tannenbaum* stated that not every possible alternative to a particular policy need be spelled out in a proxy statement. *Id.* at 553. *See TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 448, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). A comparison of those proxy statements which the Second Circuit in *Tannenbaum* found to be misleading and those which they approved makes it clear that *Tannenbaum* does not generally require disclosure of all conceivable methods of recap-

ture, but dealt only with disclosure of recapture opportunities readily available at the stroke of a pen, as were the recapture opportunities in that case. The present case is dissimilar. Unlike the board in *Tannenbaum*, the Board in the present case did not possess information about recapture which was not generally available to the general public. The information the Board did possess and the decision they made not to pursue whatever limited recapture opportunities might be available on the PBW were not material omitted facts under the standard formulated by the Supreme Court in *TSC Industries, Inc. v. Northway, Inc.*, *supra* at 449.[3]

## SALE OF MANAGEMENT CLAIMS

■ Plaintiff alleges that defendant Charles B. Johnson and his brother, Rupert Johnson (together referred to as the "Johnson Brothers"), created a plan to illegally profit from their management and control of the investment advisor. According to plaintiff's allegations, this plan consisted of three parts: (1) The Johnson Brothers formed Resources, a Delaware Corporation, and proceeded to merge Distributors into Resources; (2) Prior to the effective date of the merger, the Johnson Brothers privately placed 11.67% of the stock of Distributors, and following the merger Charles Johnson privately sold 2.35% of the stock of Resources amount to a total private placement of 14.02%; (3) A public offering of 19% of the stock of Resources was made in January 1971.

The advisory and underwriting agreements of the Fund provided that they would automatically terminate in the event of an "assignment" by Distributors. Section 2(a)(4) of the Act defines an "assignment" as "[a]ny direct or indirect transfer . . . of a controlling block of the as-

---

**3.** Even if a proxy violation were found, plaintiff would not have established a sufficient case to collect damages. In order to collect damages plaintiff must establish not only that the proxy statements were false and misleading, but also (1) that "some loss or injury [was] directly caused by the misleading proxy statements," by a "corporate act directly linked to those

statements," and (2) that "defendants' derelictions in respect to the proxy statements resulted from knowing, reckless or negligent conduct." *Tannenbaum v. Zeller*, No. 71 Civ. 2104, Fed.Sec.L.Rep. ¶ 96,938 (S.D.N.Y. July 26, 1979) *on remand from* 2 Cir., 552 F.2d 402. Neither has been established by the evidence in this case.

signor's outstanding voting securities by a security holder of the assignor . . . ." Section 2(a)(9) of the Act contains within the definition of "control" the following:

"Any person who owns beneficially . . more than 25 per centum of the voting securities of a company shall be presumed to control such company. Any person who does not so own more than 25 per centum of the voting securities of any company shall be presumed not to control such company. . . ."

At a meeting of the Fund's shareholders held on December 16, 1969, new advisory and underwriting agreements, otherwise identical to the agreements then in effect, were approved to become effective at such time as all of the outstanding shares of Distributors might be exchanged for a pro-rata distribution of the shares of Resources. Following such approval, the shareholders of Distributors received a pro-rata distribution of 220 shares of the stock of Resources for each share of the stock of Distributors which they previously held and the newly approved advisory and underwriting agreements became effective.

Prior to such share exchange and at various times during the 1969 calendar year, the Johnson Brothers sold a total of 143⅓ shares of the stock of Distributors on a private placement basis for prices varying from $400 to $600 per share to a total of six individuals having various association with the Johnson Brothers and/or Distributors. One was an attorney for Distributors, one was a trustee for the children of Andrew R. Johnson, another brother of the Johnson Brothers, and the remainder were either associated with Distributors (or relatives of such persons) or were active in the public distribution of the Fund's shares. As a result of such transactions, the shares held by the Johnson Brothers were reduced from 2,198⅓ (98.7%) to 2055 (92.26%), representing a decrease of 6.51% of the shares of Distributors held by the Johnson Brothers.

During the same 1969 calendar year, Distributors also sold 100 shares of its stock on a private placement basis for $40,000 to Judson R. Grosvenor, one of its sales mana-

gers to whom Johnson had sold 50 of the shares previously referred to for the same price per share. Distributors also issued 27.5 shares to Samuel R. Morse, an officer and director, on the completion by Mr. Morse of an employee stock acquisition program begun in 1964. The aggregate price paid by Mr. Morse over the period of his plan was $10,000 ($400 per share for 25 shares plus a 10% stock dividend of 2.5 shares). The effect of aggregating the sales by the Johnson Brothers with the sale by Distributors to Grosvenor and the issuance of shares to Mr. Morse was to reduce the holdings of the stock of Distributors by the Johnson Brothers from 98.7% to 87.3%, representing a total dilution of 11.4%.

Subsequent to the effective date of the new advisory and underwriting agreements, Johnson sold on a private placement basis for $3.00 per share an aggregate of 12,000 shares of the stock of Resources which he received on the share exchange. One such transaction occurred on May 20, 1970, and involved the sale to an associate of a wholesaler (field sales representative) of Distributors. The remaining transactions occurred on July 31, 1970, and involved the sale of various numbers of shares to individuals active in the sale of the Fund's shares on behalf of Distributors, most of whom made their purchases on behalf of trusts established for their relatives. The aggregate effect of such transactions was to reduce the holdings of the Johnson Brothers in the stock of Resources, from 87.26% to 84.91% representing an aggregate dilution of 2.35%.

On July 28, 1971, a registered public offering of 120,000 shares of the stock of Resources for $5.00 per share became effective and was completed shortly thereafter. As described by the prospectus for such offering, the purpose was to contribute $390,000 to the paid-in surplus of Distributors in order to liquidate $45,000 of outstanding bank debt and to expand the investment research, administrative and underwriting activities of Distributors. The balance of the net proceeds, approximately $100,000, was to be utilized by Resources

"to expand the scope of its operations in mutual fund or financial services field through acquisitions or otherwise."

Including nominal accounts of brokers for one or more purchasers as a single purchaser, there were 164 purchasers on such public offering. Of such purchasers, 154 purchased 3,000 shares or less. The largest such purchase was 11,400 shares for the nominee account of a broker representing approximately 1.78% of the outstanding shares of Resources. None of such purchasers acquired a controlling interest in Resources. As a result of such public offering, the holdings of the Johnson Brothers in shares of. Resources was reduced from 84.91% to 68.94% representing an aggregate dilution of 15.97%.

Approval of new advisory and underwriting agreements by the Fund's shareholders was solicited by a management proxy statement, dated November 29, 1969, which is not challenged in this action. Such proxy statement disclosed that Johnson was to receive 50.11% of the shares of Resources; that his brother, Rupert H. Johnson, was to receive 37.15% of the shares of Resources on the proposed exchange; that the proposed exchange might be deemed to constitute an "assignment" of the Fund's advisory agreement and underwriting agreement with Distributors; and that, after the exchange, Resources proposed to make a public offering which would increase its outstanding shares by 19% and decrease the shares of Resources held by Johnson and his brother to 40.68% and 30.17%, respectively.

Such proxy statement further disclosed that, during the Fund's fiscal period which ended September 30, 1969, Johnson sold 138⅓ shares of the stock of Distributors representing 5.89% of its outstanding shares to five (5) individuals on a private placement basis (subject to investment representations and restricted rights of public resale) for a total consideration of $67,250.

Plaintiff's sale of management claim relies primarily on *Rosenfeld v. Black*, 445 F.2d 1337 (2d Cir. 1971). In *Rosenfeld*, Lazard Freres ("Lazard") wished to retire as investment advisor of the Lazard Fund. Lazard used its influence to arrange a merger of the Lazard Fund with Moody's Capital Fund and the consequent appointment of Moody's as investment advisor, and in exchange Lazard received a finder's fee. The *Rosenfeld* court held that the sale of the management contract was similar to the sale of a fiduciary office and thus, improper. "If Lazard did not wish to continue as advisor and chose to recommend a successor and assist in the latter's installation, it was obliged to forego personal gain from the change of office." *Id.* at 1343.

Plaintiff attempts to portray the actions of the Johnson Brothers as an attempt to profit from the transfer of the Advisory Agreement similar to the actions of Lazard in *Rosenfeld*. The cases are dissimilar, however.

In the present case, plaintiff initially sought to challenge the public offering of 19% of the stock of Resources as a sale of control and, therefore, an assignment of the advisory and underwriting agreements. Apparently recognizing that he could not overcome the presumption of § 2(a)(9) of the Act that a block smaller than 25% does not constitute control, *see Willheim v. Murchison*, 342 F.2d 33, 39 (2d Cir. 1965), *cert. denied*, 382 U.S. 840, 86 S.Ct. 36, 15 L.Ed.2d 82 (1966), plaintiff now seeks to integrate the public offering with the private placements by the Johnson Brothers to constitute a transfer of more than 33% of the stock of Resources. Plaintiff's proof, however, fails to establish any legal basis by which this Court is required to "integrate" the numerous transactions by different parties for differing reasons in the stock of different corporations over an extensive period of time in order to construct a basis for the assignment asserted by plaintiff. It does not appear that the various transactions were effected separately to avoid a statutory "assignment" of the Fund's advisory and underwriting agreements or that there was any common theme which might serve as a legal basis for their "integration." The assertion that all such transactions resulted from the desire of Johnson and his brother to exploit their alleged control over the Fund and its investment advisor is not a legally adequate basis for the integration sought by plaintiff. *See Will-*

*heim v. Murchison, supra; Value Line Fund, Inc. v. Marcus,* Fed.Sec.L.Rep. [CCH] ¶ 91,523 (S.D.N.Y.1965).

Moreover, the 1969 transactions on which plaintiff relies primarily to arrive at an "integrated transfer" of more than 25% of the voting securities of Resources (in addition to being transactions in the stock of Distributors) occurred prior to the effective date of the allegedly assigned advisory and underwriting agreements. If anything, the 1969 transactions could have effected only an assignment of the advisory and underwriting agreements which were terminated by virtue of the action of the Fund's shareholders taken on December 16, 1969.

Even if the public offering is integrated with the private placements to constitute a single transfer of more than 33% of the stock of Resources, this would still not be sufficient to constitute a sale of control. No single individual or related group of individuals received anywhere near 25% of the stock of Resources as a result of any of these transactions, and thus none could be said to have received control under § 2(a)(9) of the Act. In fact, the Johnson Brothers continued to own some two-thirds of the stock of Resources after the public offering and remained in control of Resources. There can be no improper assignment of the underwriting and advisory agreements if control of the investment advisor remains in the same hands. *See Rosenfeld v. Black, supra,* 445 F.2d at 1346.

The only transaction which might constitute an assignment of the agreements was the merger of Distributors into Resources. There can be no liability as a result of this transaction, however, because it was accomplished without profit and in fact did not result in an actual change in the investment advisor. *Id.* The same individuals acted as investment advisor after this transaction as had before.

Because plaintiff has failed to establish any basis for liability on its sale of management claims, those claims must be dismissed.

The foregoing also disposes of the additional assertion that the failure to disclose the "assignment" of the Fund's advisory and underwriting agreements by reason of such alleged integration was a violation of the proxy rules applicable to mutual funds (Rule 20a under Section 20 of the Act and Rule 14a–9 under Section 14(a) of the Securities Exchange Act of 1934 [15 U.S.C. §§ 78n(a)]). Clearly, such proxy rules do not require the management of a mutual fund to disclose in proxy discussions any or all argumentative contentions which might subsequently be made. Since there was no basis for concluding that such disparate and chronologically remote transactions could effect an "assignment" of the Fund's advisory and underwriting agreements, there was no reason to disclose the essentially academic prospect that such a contention might subsequently be made. The fact that the exchange of Distributors' stock for that of Resources might be deemed to constitute an assignment of the agreements was disclosed.

For the reasons detailed above, the complaint is ORDERED dismissed in all respects.