**POTOMAC CAPITAL MARKETS CORP., et al., Plaintiffs,**

v.

**PRUDENTIAL–BACHE CORPORATE DIVIDEND FUND, INC., et al., Defendants.**

**No. 89 Civ. 2350 (RPP).**

United States District Court, S.D. New York.

Dec. 4, 1989.

Covington & Burling, Washington, D.C. by Harris Weinstein, Jay Smith, for plaintiffs Potomac Capital Markets Corp. and Potomac Capital Preferred Corp.

Cahill Gordon & Reindel, New York City by Thomas J. Kavaler, Lisa Pearson, Marc Bluver, Gardner, Carlton & Douglas, Chicago, Ill. by Michael E. Barry, for defendant Prudential Mut. Fund Management, Inc.

Sullivan & Cromwell, New York City by Theodore O. Rogers, Jr., for defendant Prudential–Bache Corporate Dividend Fund, Inc.

## OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge.

This action is before the Court on the defendants' motions to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6), or in the alternative, for summary judgment pursuant to Fed.R.Civ.P. 56.

## BACKGROUND

Prudential–Bache Corporate Dividend Fund, Inc. (the "Fund"), is a Maryland corporation which registered in September 1983 as an investment company with the Securities and Exchange Commission ("SEC") under the Investment Company Act of 1940 (the "ICA"). Comp. ¶¶ 3, 9. The plaintiffs, who buy and sell securities for investment purposes, first became shareholders in the Fund in January 1986. Comp. ¶ 8.

According to paragraph 10 of the Complaint,

from its inception, the Fund has described itself to actual and potential shareholder-investors as a diversified, open-end management investment company. Its investment objective, prior to the annual meeting of stockholders held on June 28, 1988, was to maximize dividend income by investing primarily in adjustable rate preferred stocks that qualify for a corporate dividends received deduction under the federal income tax laws. As the … Fund specifically informed investors in its March 31, 1988, prospectus, the Fund was 'expressly designed for corporate investors seeking the after-tax yields offered by adjustable preferred stocks.' That prospectus stated that "[a] major portion of the Fund's dividends can be expected to qualify for the dividends received deduction under federal income tax laws for corporate investors."

It also stated that "[t]here can be no assurance that the Fund's investment objective will be achieved." Whelan Aff.

According to the March 1988 prospectus, the Fund had two primary investment policies at that time. First,

The Fund will in normal circumstances have at least 65% of its total assets invested in adjustable rate preferred stocks and the remainder of its assets in conventional preferred stocks, other fixed-income securities and money market instruments (such as U.S. Treasury bills, certificates of deposit, commercial paper and repurchase agreements); no investment will be made in common stocks. . . .

Second,

As a fundamental policy, the Fund will concentrate at least 25% of its total assets in the securities of bank holding companies, inasmuch as a majority of issuers of adjustable rate preferred stocks have been such companies; provided, however, that if at some future date adverse economic conditions prevail in the banking industry, the Fund may invest temporarily, for defensive pur-

poses, less than 25% of its total assets in bank holding companies.

*Id.*

In June 1988, the Fund distributed a proxy statement seeking shareholder approval of a change in the Fund's investment objective and policies endorsed by the directors of the Fund (the individual defendants in this action). Comp. ¶ 15. The proxy statement explained that the Fund's investment advisor, Prudential Mutual Fund Management, Inc. ("PMF"), and the Fund's Board of Directors sought a change because of the decline in value of adjustable rate preferred stocks, the volatility of the market for those stocks, and the development of more promising alternatives. Whelan Aff. Ex. B. The proxy statement continued:

> The Fund's proposed investment objective will be to seek a high level of current income consistent with the preservation of capital. To achieve this new investment objective, the Fund will continue to invest primarily in securities paying dividends which qualify for the corporate dividends received deduction under federal income tax laws. The Fund, however, will no longer invest at least 65% of its total assets in adjustable rate preferred stocks. Instead, the Fund will invest in a broad range of securities, including auction rate and remarketed preferred stocks and common stocks, as well as adjustable rate preferred, other floating rate preferred and conventional preferred stocks. Under normal circumstances the Fund will continue to invest at least 65% of its total assets in these securities, each of which qualifies for the corporate dividends received deduction under federal income tax laws, and will invest the remainder of its assets in other fixed-income securities, obligations issued or guaranteed by the U.S. government ... and money market instruments.... The Fund may invest temporarily, for defensive purposes, all or a substantial portion of its assets in short-term securities, obligations issued or guaranteed by the U.S. government ... and money market instruments.

> The Fund will continue to be a diversified, open-end management company expressly designed for corporate investors.

*Id.*

At their annual meeting on June 28, 1988, the stockholders approved the proposed change. Thereafter, in October 1988, the Fund issued a new prospectus incorporating the change. Comp. ¶¶ 17, 31.

On January 10, 1989, the Fund sent a letter to its stockholders which described the actions taken by the Fund's Board of Directors at a special meeting earlier that day. Comp. ¶ 18. The letter stated:

> As you are aware from recent shareholder reports, Prudential–Bache Corporate Dividend Fund, Inc., like other mutual funds with similar objectives, has been operating for some time in an increasingly difficult investment environment which has been manifested in a rising level of redemptions and in its inability to attract new corporate investors.

> Both situations have contributed to the Fund's not obtaining sufficient asset size either for optimum investment operations or for economic viability to its investment manager, Prudential Mutual Fund Management, Inc.

> · · · · · ·

> Your Board of Directors has thoroughly considered the situation and concluded that the environment shows no promise of improving over the intermediate term. Consequently, at a special meeting held today, the Board unanimously approved a recommendation of the manager to immediately cease sales of Fund shares and liquidate its portfolio by February 15, 1989 or as soon thereafter as practicable, as being in the best interests of the Fund and its shareholders. It is anticipated that all public shareholders will redeem their shares by that date and thereafter the only shareholder will be the Fund's manager which intends to maintain the Fund's corporate existence.

Whelan Aff.Ex. E. The letter continued: "Given the expensive and time consuming nature of a portfolio liquidation," the board believed that shareholders would best be

served by voluntarily redeeming their shares promptly "rather than waiting for the final liquidation date." *Id.* The letter concluded:

> While we regret the decision to liquidate the Fund's portfolio, your Board of Directors believes that no reasonable alternative exists due to the present lack of size of the Fund, continuing substantial redemptions, high transaction and shareholder costs and increasing operating expenses, all of which continue to negatively affect the net asset value of the shares of the Fund. The only way to reduce ongoing expenses and maximize the return of the remaining dollars of the Fund to its shareholders would be to liquidate the portfolio and cease active business operations.

*Id.*

On January 11, 1989, the plaintiffs asked John F. Robichaud, an account executive with Prudential–Bache Securities, Inc., the Fund's distributor, if they could arrange a tax-free exchange of their shares in the Fund for securities from the Fund's portfolio. Finneran Aff. ¶ 4. Robichaud refused, saying that 85% of the Fund's securities had already been converted into short-term money market instruments, and that the liquidation would be 92% complete by the next day. *Id.* On January 13 the plaintiffs placed an order to redeem their shares for cash, allegedly at a substantial loss. *Id.* ¶ 7.

The results of the Board's action on January 10, 1989, are revealed in an amendment to the Fund's registration statement on a Form N–1A filed by the Fund with the SEC on March 31, 1989. Whelan Aff.Ex. D. According to that document, "After giving effect to the redemptions following notice to shareholders of the Board's determinations, as of March 28, 1989, the Fund had 22 holders of record and its total net asset value was $5,889,689." *Id.* at 1. The Fund had thus liquidated over 90 percent of the $64 million in assets it had held as recently as November 30, 1988. *Id.* at B–24.

The Form N–1A further reports that "[s]ince January 10, 1989, the assets of the Fund have been held in short-term money market instruments," and "[t]he Fund does not currently intend to invest in other securities." *Id.* at 1. As a result, "dividends paid by the Fund are no longer expected to be eligible for the 70% dividends received deduction." *Id.* at 9.

The Form N1–A also describes the relationship between the Fund, its distributor, and its manager/advisor. *Id.* at 5–8, B11–B13. It reports that at its special meeting on January 10, 1989, the Board of Directors voted to suspend payments to the Fund's distributor and to decline to accept any new subscriptions for the Fund's shares of common stock. *Id.* at 1, 6. The Form N–1A also states that on January 5, 1989, the Board approved the latest management agreement with PMF, which provides the Fund with management services and investment advice in exchange for a fee. *Id.* at B–13.[1]

## DISCUSSION

In reviewing the sufficiency of a complaint under Fed.R.Civ.P. 12(b)(6), the Court must accept the plaintiffs' pleadings at face value and construe the allegations in the complaint in the plaintiffs' favor. *Dwyer v. Regan,* 777 F.2d 825, 829 (2d Cir.1985). Dismissal of the complaint is warranted only if "it appears beyond a reasonable doubt that Plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). Summary judgment will be granted if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In deciding a motion for summary judgment, a court " 'cannot try issues of fact; it can only determine whether there are issues to be tried.' " *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 58 (2d Cir.1987) (quoting *Heyman v. Commerce & Indus. Ins. Co.,* 524 F.2d 1317, 1319–20

---

**1.** Defendants, however, contend that "[o]n January 13, 1989, PMF voluntarily waived its fees from January 10, 1989 forward." Whelan Aff. at ¶ 5.

(2d Cir.1975)). Since there has yet to be discovery in this case, the Court applies strict scrutiny before determining that there is an absence of genuine issues of material fact.

### I. *Claims Under Sections 20(a) and 34(b) of the Investment Company Act*

■ Section 20(a) of the ICA, 15 U.S.C. § 80a–20(a), makes it unlawful to solicit any proxy in respect of a security issued by a registered investment company such as the Fund in contravention of the rules and regulations prescribed by the SEC. Rule 20a–1, 17 C.F.R. § 270.20a–1(a), provides that all SEC rules and regulations adopted pursuant to Section 14(a) of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. § 78n, apply to solicitations made by registered investment companies. Under Rule 14a–9(a), 17 C.F.R. § 240.14a–9(a),

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading....

Section 34(b), 15 U.S.C. § 80a–33(b), contains an identical prohibition with regard to the documents filed pursuant to the ICA in this case: namely, the June 1988 proxy statement and the October 1988 prospectus.

The Complaint alleges that the defendants violated Sections 20(a) and 34(b) by failing to explicitly state in either the June 1988 proxy statement or the October 1988 prospectus that the Board could liquidate and close the Fund.

For undisclosed information to be material it must be important to a shareholder's evaluation of the investment. "The issue is whether, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder." *TSC Industries,*

*Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). Liquidation is an event of magnitude for both the company and for the investors.

■ Moreover, the mere fact that an act is only a future possibility does not render its non-disclosure immaterial. *See Kronfeld v. Trans World Airlines,* 832 F.2d 726, 731–37 (2d Cir.1987), *cert. denied,* 485 U.S. 1007, 108 S.Ct. 1470, 99 L.Ed.2d 700 (1988) (explaining *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833 (2d Cir.1968) (en banc), cert. denied sub nom., *Kline v. SEC,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969)).

However, Sections 20(a) and 34(b) also require that the omissions be misleading "in light of the circumstances under which they are made." The Complaint in this case makes no allegations that defendants omitted information that appeared relevant at the time of the issuance of either the proxy or the prospectus. The contested liquidation is not claimed to have been contemplated and is only alleged to be a speculative possibility. By contrast, the defendants held liable for material non-disclosure in *Kronfeld* had contingent plans for the omitted future possibility. 832 F.2d at 735. Defendants cannot be required in their proxy statement to address how a power might be used under every possible future circumstance. *See Gartenberg v. Merrill Lynch Asset Management, Inc.,* 573 F.Supp. 1293 (S.D.N.Y.1983), aff'd, 740 F.2d 190 (2d Cir.1984); *Herzog v. Russell,* 483 F.Supp. 1346 (E.D.N.Y.1979).

Although there was not explicit and specific disclosure, there was sufficient notification in light of the alleged circumstances at the time of the issuance of the proxy and the prospectus. The possibility of temporarily investing all assets in short term securities or money market instruments was disclosed and the possibility of the lack of continued specialized investment was highlighted. The Fund's shares are owned by corporations, not widows and orphans. Indeed, the Fund's prospectus and the June 1988 proxy statement were directed to those corporations that take advantage of the corporate dividends received tax deduc-

tions. Any corporate treasurer could reasonably foresee that under certain circumstances other corporate treasurers might redeem and that the Fund would become uneconomic and forced to liquidate. Corporate officers reading the proxy statement should have been aware that if the Fund, for defensive purposes, determined to invest all its assets in short term securities guaranteed by the United States government or money market instruments, then significant redemptions could occur leaving the Fund uneconomic. In such an event, a determination to seek liquidation would be possible.

The two causes of action cannot stand absent allegations that defendants at the time of the issuance of the proxy and the prospectus had plans for liquidation which they failed to mention. The Complaint alleges liability for a failure to engage in pure speculation as to how and under what circumstances a designated power might be used in the future. Accordingly, the Court grants the motion to dismiss the claims under Sections 20(a) and 34(b).[2]

## II. *Claims under Sections 13(a)(4), and 25(a) of the Investment Company Act*

■ The defendants seek to dismiss the plaintiffs' claims under ICA Section 13(a)(4), 15 U.S.C. § 80a–13(a)(4), and Section 25(a), 15 U.S.C. 80a–25(a), because the defendants contend that a private right of action should not be implied for any of these claims.

Neither Section 13(a)(4) nor Section 25(a) expressly provides for a private right of action. As a general proposition, the question of whether there exists an implied private right of action is "basically a matter of statutory construction." *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 15, 100 S.Ct. 242, 245, 62 L.Ed.2d 146 (1979). In *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975),

the Supreme Court set forth the following four factors to be considered in deciding whether a private right of action should be implied:

First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted,"—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

*Id.* at 78, 95 S.Ct. at 2088 (citations omitted; emphasis in original). "In cases decided since *Cort v. Ash,* the Supreme Court has made it clear that these factors are to be used in order to focus on Congressional intent." *Krinsk v. Fund Asset Management, Inc.,* 654 F.Supp. 1227, 1230 (S.D.N.Y.1987).

Under the analysis set forth in *Cort v. Ash,* there is no basis for implying a private right of action under either Section 13(a)(4) or section 25(a). There is no persuasive evidence that Congress intended that there be a private right of action under either section 13(a)(4) or section 25(a). The plaintiffs cite no case law implying a private right of action under either section of the ICA.[3] Moreover, the plaintiffs cite no legislative history to support their contention that Congress intended there be an implied private right of action under either section. Most importantly, there is no caselaw implying private rights of action under these sections before the 1970 and subsequent amendments to the ICA.

---

**2.** The Court need not reach the issue of whether Section 34(b) creates a private right of action because plaintiffs have failed to plead sufficiently a claim under the Section.

**3.** In *Monheit v. Carter,* 376 F.Supp. 334 (S.D.N.Y.1974), the court did not reach the issue of

whether a private right of action should be implied under section 13(a)(4), but rather dismissed the complaint because plaintiffs' pleadings were in any event insufficient to come within the statute.

The remedy Congress has enacted for failure to comply with section 13(a)(4) is to empower the SEC to find that the company ceased to be an investment company, and to refuse to deregister the company.[4] And in section 25(a), Congress specifically empowered the SEC, not stockholders, to enforce the section. Accordingly, the plaintiffs' claims under both section 13(a)(4) and section 25(a) fail as a matter of law, and the motions to dismiss these claims are granted.

### III. *Claim under Section 13(a)(3) of the Investment Company Act*

The defendants argue that the plaintiffs have failed to state a claim under section 13(a)(3) and such claim should be dismissed as a matter of law.[5] Section 13(a)(3) prohibits an investment company, without shareholder authorization, from

deviat[ing] from its policy in respect of concentration of investments in any particular industry or group of industries as recited by its registration statement, deviat[ing] from any investment policy which is changeable only if authorized by shareholder vote, or deviat[ing] from any policy recited in its registration pursuant to 80a–(b)(3)."

The defendants do not deny that the Fund deviated from its two express percentage limitations: the policy that the Fund invest at least 65 percent of its total assets in securities paying dividends that qualify for the corporate dividends received deduction under federal income tax laws; and the policy that the fund concentrate at least 25 percent of its total assets in the securities of bank holding companies. Rather, the defendants argue that these policies, which apply only under "normal" circumstances, did not restrict their actions in January of 1989, by virtue of the following two statements in the proxy materials approved by the shareholders:

If at some future date adverse economic conditions prevail in the bank industry, the Fund may invest temporarily, for defensive purposes, less than 25% of its total assets in bank holding companies....

.    .    .    .    .

The Fund may invest temporarily, for defensive purposes, all or a substantial portion of its assets in [short-term instruments].

Def.Br. at 32–33 (quoting Whelan Aff.Ex. D, Form N–1A dated August 5, 1988, at 6).

The defendants' arguments do not permit dismissal of the plaintiffs' claims. First, the plaintiffs' complaint alleges facts indicating that the conversion of the Fund's portfolio to money market instruments was not "temporary." The plaintiffs find support for these allegations in the January 10, 1989 letter to shareholders, indicating that, without shareholder approval, the Board of Directors decided the Fund should " 'liquidate the portfolio and cease active business operations'." Comp. ¶ 18. They also find support in Form N–1A, which reported that all the Fund's assets had been in money market instruments since January 10, that "the Fund does not currently intend to invest in other securities," and that the Fund's assets were less than $6 million, an amount that was less than 10% of the assets owned on November 30, 1988.

Second, there is a genuine issue of material fact with respect to the question of whether or not economic conditions were "abnormal" or "adverse" in January of

---

**4.** Plaintiffs argue that since there is an implied cause of action under section 13(a)(3), there should logically be one implied under section 13(a)(4). Congressional intent that there be an implied private right of action under one section of a statute does not necessarily mean that Congress intended that a private right of action be implied under another section and plaintiff has failed to cite any persuasive authority implying a private right of action under section 13(a)(4).

**5.** A private right of action is not expressly provided for under Section 13(a)(3); however, defendants have not argued that plaintiffs' Section 13(a)(3) claim should be dismissed because there is no implied private right of action. Private rights of action have been recognized under Section 13(a)(3) in *Monheit v. Carter,* 376 F.Supp. 334, 339 (S.D.N.Y.1974); *Green v. Brown,* 276 F.Supp. 753 (S.D.N.Y.1967), remanded on other grounds, 398 F.2d 1006 (2d Cir.1968).

1989. The record is devoid of evidence indicating that the economic conditions in the market for the Fund's securities which prevailed in January of 1989 permitted the actions that the Fund's Board of Directors took in January 1989.

Accordingly, the defendants' motion to dismiss and motion for summary judgment with respect to the plaintiffs' Section 13(a)(3) claim are denied.[6]

## IV. *Claim Under Section 36(b) of the Investment Company Act*

■ Section 36(b) of the ICA, 15 U.S.C. § 80a–35(b), states that an investment adviser to an investment company has a fiduciary duty with respect to the fees it is paid for its services. The plaintiffs have alleged that as of the date the Fund began converting its portfolio to cash equivalents, PMF, the Fund's investment adviser, breached its fiduciary duty by receiving or retaining the fees it was paid. Comp. ¶ 47.

The defendants argue that the Fund did not begin converting its portfolio of preferred stocks into money market instruments until after January 1989 and that PMF voluntarily waived its fees from that time forward. Whelan Aff. ¶ 5. Plaintiffs contend that the waiver occurred after the date that plaintiffs redeemed their shares, if it occurred at all. Plaintiff's contention is based upon dates in the Form N1A, Whelan Aff.Ex. D at 1, and the difficulty defendants would have had selling the entire portfolio in a short period of time in early January due to the character of the market. Finneran Aff. ¶ 18.

There has been no discovery. Resolution of the factual dispute at this point would be premature. Accordingly, defendants' motion to dismiss and motion for summary judgment with respect to the plaintiffs' section 36(b) claim are denied.

6. There is no contradiction between the granting of defendants' motions with respect to the causes of action under Sections 20(a) and 34(b) and the denial of the motions with respect to the cause of action under Section 13(a)(3). Sections 20(a) and 34(b) present a different issue than Section 13(a)(3). Sections 20(a) and 34(b) proscribe misleading omissions in documents.

## V. *State Law Claims*

### A. *Breach of Fiduciary Duty*

■ The plaintiffs' seventh cause of action alleges that the Fund's directors breached fiduciary duties in carrying out their plan "to liquidate the Fund's portfolio and cease active business operations ... without any attempt to protect shareholders from the tax and other financial consequences of the liquidation." Complaint ¶ 50. It is clear under Maryland law that directors of a corporation will not be liable for acts undertaken for a valid corporate purpose unless they were "grossly negligent." *Devereux v. Berger*, 264 Md. 20, 284 A.2d 605 (1971).

The defendants argue that the plaintiffs have failed to state a claim under the laws of Maryland because the Complaint characterizes the defendants' actions as "negligent" rather than "grossly negligent." The Complaint alleges that the defendants' conduct constituted "negligence," but does not specifically state that they were "grossly negligent."

The plaintiffs respond that "[a]lthough the cases relied upon by the defendants do hold that Maryland law requires a high degree of negligence before a breach of fiduciary duty will be found, none of them dismissed a claim merely for omitting the word 'gross' from the allegations in the complaint that characterized the defendants' negligence." Pl.Br. at 63.

The Court finds that the Complaint's statement that the defendants acted "without any attempt to protect shareholders" sets forth a sufficient allegation to establish a cause of action for "gross negligence." Accordingly, the defendants' motion to dismiss and motion for summary judgment with respect to the plaintiffs' state law claim for breach of fiduciary duty are denied.

Section 13(a)(3) regulates the application of statements contained in documents. The proxy statement and prospectus were not misleading because they addressed sufficiently the future possibility of a liquidation. However, there is an issue of fact as to whether the actual liquidation was in accordance with the authority granted by the stockholder vote.

## B. *Transfer Without Shareholder Approval*

 The plaintiffs' eighth cause of action alleges that when the directors sold the Fund's entire investment portfolio, they violated Md.Corps. & Ass'ns Code § 3–105(d) (1985) by failing to obtain shareholder approval. Comp. ¶ 53. Section 3–105(d) requires that a transfer of assets be approved by shareholders.

First, the defendants argue that the Fund's liquidation of its portfolio was a conversion of its assets from one investment to another, not a transfer of assets to a third party. The defendants sold a portfolio of assets consisting primarily of securities qualifying for the dividends received deduction, and subsequently bought another portfolio of assets consisting of money market instruments. Although a "transfer of assets" generally has the meaning ascribed by defendants, no authority is cited to show that Maryland law does not regard this type of liquidation as a transfer of assets.

Second, the defendants argue that even if this action constituted a transfer of assets under Maryland law, such transfer occurred in the ordinary course of the Fund's business, and hence, no shareholder approval was required under Md. Corps. & Ass'ns Code § 3–104(a).[7] The authority of the directors of the Fund to take the actions under Maryland law with respect to liquidating the Fund's portfolio has not been adequately demonstrated by the defendants. If the directors did not in fact have such authority, then the defendants' argument that the liquidation occurred in the ordinary course of the Fund's business clearly fails. Accordingly, the defendants' motions to dismiss and for summary judgment with respect to the plaintiffs' state law claims under Section 3–105(d) are denied.

### CONCLUSION

The Court dismisses the claims based upon ICA Sections 20(a), 34(b), 13(a)(4) and 25(a). The motions to dismiss and for summary judgment with regard to the claims based upon 13(a)(3), 36(b) and state law are denied.

---

**7.** Section 3–104(a) exempts a corporation from the shareholder approval requirement when the transfer of assets occurs in the "ordinary course of business actually conducted by it...."